1

2

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 SHELLEY A. HARLAN,                           No. 2:11-CV-1121-CMK

12                     Plaintiff,

13           vs.                                MEMORANDUM OPINION AND ORDER

14 COMMISSIONER OF SOCIAL
   SECURITY,

15                     Defendant.

16 _____/

17

18           Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19 review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20 Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21 judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

22 before the court are plaintiff's motion for summary judgment (Doc. 21) and defendant's

23 opposition thereto (Doc. 22).

24 / / /

25 / / /

26 / / /

1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on January 19, 2005.  In the application, plaintiff claims that disability began on November 15, 2004.  Plaintiff claims that disability is caused by a combination of ". . .degenerative disc disease, multi-state osteoarthrosis primarily in the ankle and foot, obesity, depression, lupus, and hepatitis C."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on November 29, 2006, before Administrative Law Judge ("ALJ") Mark C. Ramsey.   In a May 23, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1. The claimant has the following severe impairments: degenerative disc disease of the cervical spine and hepatitis C;
>
> 2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;
>
> 3. The claimant has the residual functional capacity to perform light work with no more than occasionally climbing, balancing, stooping, crawling, crouching, or kneeling; and
>
> 4. Based on the claimant's age, education, work experience, residual functional capacity, and Medical-Vocational Guidelines, jobs exist in significant numbers in the national economy that the claimant can perform.

On November 2, 2007, the Appeals Council remanded the matter with the following instructions:

> 1. Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations.  In so doing, evaluate the examining source opinion pursuant to the provisions of 20 C.F.R. § 416.927 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence.  As appropriate, the Administrative Law Judge may request the examining source to provide additional evidence and/or further clarification of the opinion; and
>
> 2. If needed, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. . . . Further, before relying on the vocational expert evidence the Administrate Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles ("DOT"). . . .

1    Another hearing was held on March 11, 2008, before ALJ Peter F. Belli.  In an

2 April 11, 2008, decision, the ALJ concluded that plaintiff is not disabled based on essentially the

3 same findings reached by ALJ Ramsey, with only a few differences.  As to plaintiff's residual

4 functional capacity, ALJ Belli concluded:

> . . . [Claimant] is not able to climb ladders, ropes, or scaffolds.
> She is not able to crawl.  She can occasionally stoop, crouch, and kneel.
> She needs to be allowed frequent flexing and extending of the cervical
> spine.  She is not able to hold prolonged fixation of her cervical spine and
> she needs to change her position every 15 to 30 minutes.

As to jobs available to plaintiff, ALJ Belli considered vocational expert testimony and concluded

that plaintiff is capable of performing her past relevant work as an ordained minister, gas station

manager, or park tour guide.  On April 30, 2009, the Appeals Council once again remanded

plaintiff's case, with the following instruction: "If warranted, obtain supplemental evidence from

a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational

base. . . ."  The ALJ was once again instructed to identify and resolve any conflicts between the

vocational expert's testimony and the DOT.

    A third hearing was held on November 18, 2009, before ALJ Ramsey.  In an April

9, 2010, decision, the ALJ again concluded plaintiff was not disabled.  ALJ Ramsey's findings

were the same as in his first decision, except that he defined plaintiff's residual functional

capacity for light work as follows:

> . . . [T]he claimant can sit for 6 hours, in 2 hour increments, and
> stand and walk for 6 hours, in 1-2 hour increments, in an 8 hour day.  In
> addition, the claimant can perform occasional squatting, crouching, and
> climbing.  Moreover, she should be allowed to change her neck position
> for comfort.

As to available jobs, ALJ Ramsey considered vocational expert testimony and concluded that

there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

After the Appeals Council declined further review on February 23, 2011, this appeal followed.

/ / /

/ / /

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).


## III.  DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ failed to fulfill his duty to develop and/or update the records regarding plaintiff's physical and mental residual functional capacity; (2) the ALJ erred at step two of the sequential analysis in failing to find that plaintiff's depression, obesity, osteoarthrosis of the left foot/ankle, and lupus are severe impairments; (3) the ALJ erred in determining that plaintiff's testimony was not credible; (4) the

1   ALJ erred by ignoring lay witness testimony; and (5) the ALJ failed to credit the testimony of

2   the vocational expert in response to hypothetical questions which accurately reflected plaintiff's

3   functional limitations.

4          A.      **Duty to Develop the Record**

5                  The ALJ has an independent duty to fully and fairly develop the record and assure

6   that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

7   Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

8   especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously

9   and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

10  Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding

11  that the record is inadequate triggers this duty.  See  Tonapetyan, 242 F.3d at 1150.  The ALJ

12  may discharge the duty to develop the record by subpoenaing the claimant's physicians,

13  submitting questions to the claimant's physicians, continuing the hearing, or keeping the record

14  open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v.

15  Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

16                 Plaintiff argues that the opinion evidence relied on by the ALJ in the latest

17  hearing decision was stale and, as a result, the ALJ was under an obligation to obtain fresher

18  evidence.  The court does not agree.  It is well-settled that the burden is on the plaintiff to

19  produce evidence of disability.  Only where the existing record is ambiguous or inadequate does

20  the ALJ have a duty to develop the record.  Neither is the case here.  The evidence relied on by

21  the ALJ is neither ambiguous nor inadequate.  To the contrary, the evidence was such that the

22  ALJ was able to render a decision supported by substantial evidence.  If plaintiff believes that

23  more recent evaluations would have showed disability, it was incumbent upon her to produce

24  such evidence in the first instance.  Plaintiff cites no case, and the court is aware of none, which

25  holds that opinion evidence more than some number of years removed from the date of the

26  hearing decision triggers the duty to develop the record.

**B.**   **Step Two Severity Determination**

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[1]   In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  See id.

Plaintiff argues that the ALJ erred by failing to find her depression, obesity, osteoarthrosis, and lupus to be severe impairments at step two.

1.   Depression

Plaintiff argues that the ALJ conducted the step two severity analysis using the more stringent analysis at step three, which applies only in considering whether a severe impairment meets an impairment listed in the regulations.  The court does not agree.  While the ALJ's discussion of plaintiff's depression is offered in the context of a step three Listings

---

[1]   Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1  analysis, the analysis is sufficient to show that the ALJ did not feel that plaintiff's depression

2  was even a severe impairment.  In other words, the analysis sufficed to satisfy both steps of the

3  analysis because the ALJ found plaintiff's depression to be so insignificant as to not be severe or

4  meet a Listing.

5          This analysis is supported by the record, notably plaintiff's own statements to

6  doctors.  In particular, treating records from Dale Stemple, M.D., reflect that, in March 2009,

7  plaintiff denied any depression or anxiety.  Moreover, as plaintiff testified, she had not received

8  any treatment in the past ten years for mental problems.  Not only was the evidence insufficient

9  to satisfy the Listings, the court agrees with defendant that "Plaintiff did not meet her burden to

10  establish severity."

11          2.    Obesity

12          In 1999, obesity was removed from the Listing of Impairments.[2]  Obesity may

13  still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's

14  musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181

15  n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

16  consider obesity in a multiple impairment analysis, but only where it is "clear from the record

17  that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also

18  Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that

19  a multiple impairment analysis is not required where "the medical record is silent as to whether

20  and how claimant's obesity might have exacerbated her condition" and "the claimant did not

21  present any testimony or other evidence . . . that her obesity impaired her ability to work").

22  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by

23  acknowledging the plaintiff's weight in making determinations throughout the sequential

24

25          [2]    Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is
26  considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height
    in meters (weight divided by square of height).

7

1   analysis.  See Burch, 400 F.3d at 684.

2   　　　　Plaintiff argues that the ALJ erred in not finding her obesity a severe impairment

3   at step two.   However, she points to no evidence indicating that obesity exacerbates any of her

4   other conditions.  Nor does plaintiff point to any place in the record where she ever complained

5   that obesity contributed to disability.  In short, this case is similar to Burch, where no multiple

6   impairment analysis was required.  Here, the ALJ adequately considered plaintiff's weight by

7   noting it in the hearing decision.

8   　　　　　　　3.　　　Osteoarthrosis & Lupus

9   　　　　Plaintiff argues that the ALJ erred in failing to find osteoarthrosis and lupus

10  severe impairments at step two.  The court does not agree.  Plaintiff has not cited to any evidence

11  indicating that either of these conditions more than minimally affected her ability to work.

12  　　**C.**　　**Plaintiff's Credibility**

13  　　　　The Commissioner determines whether a disability applicant is credible, and the

14  court defers to the Commissioner's discretion if the Commissioner used the proper process and

15  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

16  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

17  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

18  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

19  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

20  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

21  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

22  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

23  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

24  / / /

25  / / /

26  / / /

1        If there is objective medical evidence of an underlying impairment, the

2  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> 5              The claimant need not produce objective medical evidence of the
>           [symptom] itself, or the severity thereof.  Nor must the claimant produce
> 6         objective medical evidence of the causal relationship between the
>           medically determinable impairment and the symptom.  By requiring that
> 7         the medical impairment "could reasonably be expected to produce" pain
>           or another symptom, the Cotton test requires only that the causal
> 8         relationship be a reasonable inference, not a medically proven
>           phenomenon.
>
> 9
>           80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
> 10        Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

11        The Commissioner may, however, consider the nature of the symptoms alleged,

12  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13  947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

14  claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

15  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

16  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

17  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19  claimant cooperated during physical examinations or provided conflicting statements concerning

20  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21  claimant testifies as to symptoms greater than would normally be produced by a given

22  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24  / / /

25  / / /

26  / / /

1    Regarding reliance on a claimant's daily activities to find testimony of disabling

2   pain not credible, the Social Security Act does not require that disability claimants be utterly

3   incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

4   repeatedly held that the   ". . . mere fact that a plaintiff has carried out certain daily activities . . .

5   does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

6   Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

7   Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

8   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

9   restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

10  claimant was entitled to benefits based on constant leg and back pain despite the claimant's

11  ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

12  activities are not easily transferable to what may be the more grueling environment of the

13  workplace, where it might be impossible to periodically rest or take medication").   Daily

14  activities must be such that they show that the claimant is ". . .able to spend a substantial part of

15  his day engaged in pursuits involving the performance of physical functions that are transferable

16  to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

17  before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

18  Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

19          As to the credibility of plaintiff's testimony, the ALJ stated:

20          At the hearing, the claimant reported that she has not worked since 2004,
            as she experiences neck and hand pain, dizziness, and nausea.  The
21          claimant also indicated that she has lupus, which causes fatigue.  She
            stated that she is depressed and rarely socializes.  The claimant alleged
22          that she can only sit for 5-10 minutes, stand for 5 minutes, and walk for 10
            minutes at a time.  She stated that she must rest and lie down for about 6-7
23          hours a day.  The claimant noted that she rarely performs housework, and
            has depended on her mother for the past 16 months.
24
            After careful consideration of the evidence, the undersigned finds that the
25          claimant's medically determinable impairments could reasonably be
            expected to cause the alleged symptoms; however, the claimant's
26          statements concerning the intensity, persistence, and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Despite the claimant's allegation of disabling joint pain, the record does not contain any serious objective findings that support the severity of the claimant's allegation.  The record does not contain any post-surgical diagnostic testing such as x-rays, tomography, magnetic resonance imaging, or nerve conduction studies that shows any serious abnormality.  Moreover, the record shows that examinations have not reflected any neurological involvement, or muscle wasting or atrophy, usually associated with pain and inactivity.  In fact, examinations subsequent to claimant's spinal surgery in February 2005 only revealed some loss of motion of the neck and mildly diminished sensation over the fingers of the hand.  Certainly, if the claimant's allegation of limitations were fully credible, one would expect examination to reveal some muscle wasting or atrophy after almost four years of inactivity.

Furthermore, the record does not show that the claimant is undergoing any type of specialized course of treatment for her musculoskeletal complaints.  In fact, the treatment that the claimant has received since February 2005 has been routine and conservative in nature.  In addition, examiners have not referred the claimant for additional diagnostic testing or hospitalization for further investigation of her complaints.

The record does not show that the claimant participates in any alternative pain management program for her symptoms such as physical, chiropractic, or pain management therapy.

Moreover, no physician has suggested that the claimant's ability to perform work is seriously limited or noted that she is disabled.  Furthermore, treating records do not show that the claimant reported that her ability to care for her personal needs or activities of daily living is significantly impaired.  In fact, in December 2008, the claimant admitted that she is "going non-stop" and a physician suggested that the claimant "take it easy."  Moreover, treating records do not show that the claimant reported any specific limitations to any physician.

In addition, the record does not show that the claimant reported that her medication is not effective or that it causes any significant side effects.  The record also shows that at times, the claimant admitted that she does not need any pain medication.

The Administrative Law Judge also notes that although the claimant reported a post history of hepatitis, the record does not reflect that she has participated in any treatment since her alleged date of disability.  Moreover, the record does not show that the claimant reported any related side effects such as fatigue, to any treating sources.  Although the record does show that the claimant reported dizziness, nausea, and vomiting, physicians have suggested that these symptoms may be related to her neck pain, rather than hepatitis or any serious gastrointestinal impairment.  Moreover, treating records do not show that the claimant experienced a

significant weight loss because of her dizziness, nausea, and vomiting.

In fact, the claimant weighed 197 pounds in December 2004 (Exhibit B-5F, page 7) and 196 pounds in November 2009 (Exhibit B-13F) and she has been described as obese on multiple occasions.  However, no physician has suggested that the claimant's weight causes any additional limitations or affects her ability to perform the demands of ongoing work activity.  Moreover, the claimant has not reported significant impairment of hips, knees, or ankles to any treating physician, joints most affected by obesity.  In addition, it appears that the claimant's weight has not had an adverse effect on her cardiac or pulmonary status.

Although the claimant reported that she has lupus (statements at the hearing) the record does not contain any evidence of related impairment or show that she is undergoing any associated treatment.

The Administrative Law Judge noted that despite the claimant's allegation of serious mental limitations, the record does not show that she is participating in therapy or been hospitalized for her symptoms.  Furthermore, other than a couple of references to situation stress in 2005 (Exhibit B-7F) and 2009 (Exhibit B-13F), the record is devoid of any evidence of a mental impairment.  In addition, the claimant has been able to functional independently despite her complaints.  The Administrative Law Judge concludes that it would seem reasonable that if the claimant's allegations were considered credible, that she would seek some type of treatment.  The Administrative Law Judge recognizes that the claimant experiences some occasional symptoms related to her family situation, however, given the evidence as a whole, the Administrative Law Judge is not persuaded that her complaints are fully credible and would result in any limitation.

Nevertheless, this is not to say that the claimant's report of pain is totally without merit.  The record reflects that the claimant continues to experience some ongoing symptoms related to the 2004 accident.  However, given the record as a whole, the Administrative Law Judge concludes that the claimant's complaints are not disabling in nature, as the record shows that she is able to perform the demands of a wide range of light work activity.

According to plaintiff, this analysis is flawed because ". . .an ALJ may not reject subjective symptom testimony simply because there was no showing that the impairment could produce the *degree* of symptoms alleged."  (emphasis in original).  Plaintiff argues:

In rejecting Ms. Harlan's testimony, the ALJ found that her "complaints" were "excessive when compared to the very limited objective findings after her surgery."  TR 37.  He opined that no treating source had recommended "further surgery, physical therapy, or more aggressive measures such as epidural steroid injections or further

diagnostic testing." TR 37.  First, depression and lupus are not treated
with surgery, physical therapy, or epidural injections.  Second, further
diagnostic testing – x-rays – was ordered on her left foot/ankle.  TR 318.
Consequently, the ALJ's articulated reasons for rejecting Ms. Harlan's
testimony were refuted by the actual record.

In making this argument, plaintiff challenges ALJ Ramsey's analysis as set forth in the May 23,

2007, hearing decision (pages 31-38 of the record), and not the most recent hearing decision

constituting the agency's final determination (pages 15-24 of the record).  Plaintiff's argument,

therefore, is inapplicable in this case.

In any event, the court finds that the relevant ALJ analysis – as set forth in the

most recent hearing decision dated April 9, 2010 – is consistent with the law and supported by

substantial evidence.  The ALJ cited several legitimate reasons for discrediting plaintiff's

testimony.  The ALJ first noted that the record contains little in the way of objective findings

after plaintiff's spinal surgery in 2005.  While the ALJ may not discount a claimant's credibility

merely due to lack of objective findings to support subjective complaints, the ALJ in this case

provided additional reasons.  For example, the ALJ noted an unexplained failure to seek

specialized treatment.  The ALJ also noted that, while plaintiff stated she has lupus, there is no

indication of any treatment for that condition in the record, a fact which is inconsistent with

plaintiff's subjective claim of lupus.  Similarly, plaintiff's statement that she is "going non-stop"

is inconsistent with her testimony that she suffers from disabling symptoms.  Either of these

reasons – the failure to seek treatment or plaintiff's inconsistent statements – is sufficient to

support the ALJ's credibility finding.

## D.    **Lay Witness Testimony**

In determining whether a claimant is disabled, an ALJ generally must consider lay

witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

1    F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

2    of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

3    919.  ALJ may cite same reasons for rejecting plaintiff's statements to reject third-party

4    statements where the statements are similar.  See Valentine v. Commissioner Soc. Sec. Admin.,

5    574 F.3d 685, 694 (9th Cir. 2009) (approving rejection of a third-party family member's

6    testimony, which was similar to the claimant's, for the same reasons given for rejection of the

7    claimant's complaints).

8                The ALJ, however, need not discuss all evidence presented.  See Vincent on

9    Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

10   why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d

11   700, 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored

12   evidence which was neither significant nor probative.  See id. at 1395.  As to a letter from a

13   treating psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

14   uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

15   controverted by other medical evidence considered in the decision.  See id.  As to lay witness

16   testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

17   concluded that the evidence was properly ignored because it "conflicted with the available

18   medical evidence" assessing the plaintiff's mental capacity.  Id.

19               In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

20   disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay

21   witness had testified about the plaintiff's "inability to deal with the demands of work" due to

22   alleged back pain and mental impairments.  Id.   The witnesses, who were former co-workers

23   testified about the plaintiff's frustration with simple tasks and uncommon need for supervision.

24   See id.  Noting that the lay witness testimony in question was "consistent with medical

25   evidence," the court in Stout concluded that the "ALJ was required to consider and comment

26   upon the uncontradicted lay testimony, as it concerned how Stout's impairments impact his

1   ability to work." <u>Id.</u> at 1053.   The Commissioner conceded that the ALJ's silent disregard of the

2   lay testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

3   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  <u>See id.</u> at

4   1054-55.  The court concluded:

5               Because the ALJ failed to provide any reasons for rejecting competent lay
                testimony, and because we conclude that error was not harmless,
6               substantial evidence does not support the Commissioner's decision . . .

7               <u>Id.</u> at 1056-67.

8               From this case law, the court concludes that the rule for lay witness testimony

9   depends on whether the testimony in question is controverted or consistent with the medical

10  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  <u>See</u> <u>Vincent</u>, 739 F.2d

11  at 1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

12  consider and comment upon it.  <u>See</u> <u>Stout</u>, 454 F.3d at 1053.

13              Plaintiff argues that the ALJ erred by completely ignoring lay witness statements

14  from plaintiff's mother, Lola Rogers, and long-time friend, Heidi Carr.  In opposition, defendant

15  cites <u>Valentine</u> for the apparent proposition that, because the lay witness testimony was the same

16  as plaintiffs, and because the ALJ properly rejected plaintiff's testimony, the ALJ "need not

17  necessarily delineate reasons for rejecting a third party witness's testimony or reports. . . ."  The

18  situation in <u>Valentine</u>, however, is not quite the same as in this case.  Here, the ALJ was

19  completely silent as to statements provided by plaintiff's mother and friend.  In <u>Valentine</u>, the

20  ALJ at least acknowledged the existence of lay witness evidence by rejecting it for the same

21  reasons as provided for rejecting the plaintiff's testimony in that case.  The court cannot say that

22  the <u>Valentine</u> rationale applies in this case where the ALJ was completely silent as to lay witness

23  evidence because the court has no way of knowing that the ALJ ever considered such evidence

24  in the first place.

25  ///

26  ///

1    In any event, the ALJ's silent disregard for the statements provided by Ms.

2   Rogers and Ms. Carr may be appropriate if the statements are contradicted by the medical

3   evidence.  On October 15, 2009, Ms. Rogers provided the following statement:

4        My daughter Shelley Harlan has been in constant pain in her neck
         and left foot since her terrible motorcycle wreck.  She also has vertigo
5        which is severe.  I have watched Shelley go from a Firefighter/EMT and
         much volunteer groups such as The Human Response Crisis Hot Line and
6        the Red Cross and Member of the Grand Jury, to a person who has a hard
         time just keeping up her house.  Shelley has tried to work but has had to
7        terminate due to her heath.  Some of her friends even called me very
         concerned about her.  She would much rather be able to support herself.
8        She has told me she is very depressed and feels useless because of her
         inability to perform even the easiest of tasks.  She lays down most of the
9        day and is always tired.  Knowing my daughter it is my opinion she is no
         longer able to be gainfully employed.

10

11  On November 19, 2009, Ms. Rogers provided the following additional statement:

12       To whom it may concern:

13       This is my statement regarding my daughter, Shelley.  I would like to
         comment on her conditions and how they have affected her daily living
14       tasks.  I personally have been helping her for the last several months or so,
         although she has needed help before that.  Shelley used to be very
15       independent and did more than most women in the world.  She absolutely
         despises the fact that she now cannot do most of her normal tasks and
16       needs help on a daily level.  Every day I go to her house to do her dishes
         for her, empty the trash, pick up around the house, just in general do
17       whatever needs to be done.  Then, about twice a week I come over and get
         her laundry to do for her.  Whenever she needs to go to the store I take her
18       with me but she often will go and sit in the car after about 10 minutes due
         to her pain level; so I finish shopping for her.  However, if there is an
19       electric riding cart she will sometimes use one of those.  I also take her to
         her doctor appointments but I notice that waiting in the office to be seen is
20       hard for her since she can't sit or stand for too long of a time period.  I
         have asked her to go to church with me since she used to go on a regular
21       basis but she stays home all the time now because she can't sit through an
         entire service due to pain.  My daughter has progressively gotten worse.
22       She also suffers acute fatigue, vertigo, and vomiting almost daily.  This is
         hard for me to see my once active daughter in the community, her church,
23       and volunteer for numerous organizations.  Now she rarely even socializes
         even with her immediate family.  Her pain has been constant ever since
24       her accident, now she has lupus and osteoarthritis which I have seen in her
         hands, fingers, and feet.  Her depression is disturbing because although
25       Shelley has been in pain she always had a bright outlook on life!!  She
         really feels guilty that her mother has to help her, since I am 78 years old.
26       I know that she would be doing all of these above things for herself if she

16

possibly could.

I want to thank the courts for their consideration of this case for my daughter and I hope that you will rule in her favor and get her some help.

Ms. Carr provided the following statement on November 14, 2009:

To whom it may concern:

This letter is in regard to Shelley Harlan.  I have known Shelley for approximately 20 years and we have maintained a close relationship.  I would like to address some issues that I have noticed regarding her health.  When I first met Shelley, we were both volunteer firefighters and first responders in French Gulch, CA.  She was a very active and energetic woman who was also raising her 3 children at the time.  Unfortunately, Shelley had a severe motorcycle accident where she suffered a broken neck as well as other injuries, including an injured ankle.  After her rehabilitation, which involved wearing a halo for quite some time, she suffered much pain.  I have not seen her without one day of pain since that time.  I have also noticed that over the years she has progressively decreased her activity levels immensely.  In fact, Shelley has trouble doing daily living tasks such as housework, laundry, dishes, cooking, etc.  We have gone to the grocery store together and she has not been able to shop for more than about 10 minutes before she has to quit and go rest due to pain.  She has also become reclusive and isolated and does not engage in social activities as she used to.  In fact, Shelley, at one time, used to be a crisis hotline advisor and also served on a grand jury in Weaverville, CA.  She has always been available to help any of her friends or her children's friends that were in need.  She no longer does any of this.  It has greatly concerned me to see this decline in my friend.  I know that she has tried to work throughout the years but has not been able to maintain employment due to her physical and mental health problems.

Shelley just recently informed me that she has the new diagnoses of Lupus and Fibromyalgia, as well as depression and chronic fatigue.  She told me that she has received some new medications for these health problems but I have not seen much improvement as of yet.  Furthermore, having Fibromyalgia myself, I am aware of how little medication helps the symptoms of this seriously life inhibiting problem can be.  It is no wonder to me that I have seen her decline with broken neck issues that will last her lifetime, as well as her new problems.

I would respectfully like to ask the courts to seriously consider helping Shelley in any way that you can.  She is a sincerely good person who would much rather work than live and feel like she currently does.  I hope that you will rule in her favor so that she can hopefully be able to obtain some of the help that she deserves.

/ / /

1      The court finds that these statements are indeed contradicted by the medical

2   evidence.  For example, both statements indicate that plaintiff has lupus.  There is no evidence,

3   however, of such a diagnosis ever having been rendered.  Similarly, Ms. Carr states that plaintiff

4   has fibromyalgia, a diagnosis which does not appear in the record.  Further, both statements

5   indicate that plaintiff cannot stand/walk for more than 10 minutes due to pain and fatigue.  The

6   objective medical evidence, however, does not support such a limitation.  As the ALJ noted:

7           The record also shows that in March 2007 the claimant underwent
            comprehensive orthopedic evaluation and reported ongoing neck pain and
8           vertigo.  Upon examination, sensation was somewhat decreased over the
            right hand and range of motion of the cervical spine was mildly limited.
9           The examiner noted that the claimant was doing reasonably well, and is
            able to . . . sit for 6 hours, in 2 hour increments, and stand and walk for 6
10          hours, in 1-2 hour increments, in an 8 hour day.

11   Similarly, in April 2005, an agency consultative doctor opined, based on a review of records,

12   that plaintiff could stand/walk for 6 hours in an 8-hour day.  These medical opinions, which are

13   based on objective evidence, are inconsistent with the lay witnesses' statements.  Because the lay

14   witness statements are contradicted, the ALJ did not err in disregarding them without comment.

15          E.      **Vocational Expert Testimony**

16          The ALJ may meet his burden under step five of the sequential analysis by

17   propounding to a vocational expert hypothetical questions based on medical assumptions,

18   supported by substantial evidence, that reflect all the plaintiff's limitations.  See Roberts v.

19   Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically, where the Medical-Vocational

20   Guidelines are inapplicable because the plaintiff has sufficient non-exertional limitations, the

21   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

22   1341 (9th Cir. 1988).

23          Hypothetical questions posed to a vocational expert must set out all the

24   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

25   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

26   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

18

1    has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

2    the ALJ may pose to the expert a range of hypothetical questions based on alternate

3    interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

4    determination must be supported by substantial evidence in the record as a whole.  See Embrey

5    v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

6             Plaintiff argues that the ALJ improperly rejected the vocational expert's

7    testimony in response to a hypothetical question posed by her attorney which included as

8    limitations the need to lie down during the day when needed, the need to move around when

9    sitting, and the need to move her neck while sitting.  In response to counsel's question, the

10   vocational expert testified that a limitation to the need to lie down during the day would not be

11   acceptable to employers.  Plaintiff argues that, had the ALJ accepted this testimony, she would

12   be considered disabled.

13            Addressing the limitations related to sitting first, the hearing decision reflect that

14   the ALJ gave "significant weight" to a medical source statement provided by Dr. Pliam, a

15   treating physician.  The ALJ stated:

16                 . . . This physician indicated that although he believed the claimant can
                   perform light work, he indicated that the claimant's ability to perform
17                 postural activities is limited and noted that when sitting the claimant
                   should be able to move and change her neck position for comfort (Exhibit
18                 B-10F).  The Administrative Law Judge gives this opinion significant
                   weight as it is well supported by the results of the examination, and
19                 appears to be most representative of her ability to perform work.

20   This summary is consistent with Dr. Pliam's conclusion, based on his evaluation, that "[i]f

21   sitting, [plaintiff] should be able to move about and change her neck position as needed for

22   comfort."  Plaintiff argues that the ALJ erred by asking the vocational expert only about the

23   limitation to move her neck as needed and not the separate limitation to move about while

24   sitting.  Again, the court notes that, in making this argument, plaintiff references ALJ Belli's

25   discussion in the April 11, 2008, hearing decision and not ALJ Ramsey's most recent hearing

26   decision.

1      In any event, the current hearing decision reflects that the ALJ did in fact accept

2  Dr. Pliam's restriction – that plaintiff should be able to move and change her neck position when

3  sitting.  According to plaintiff,  Dr. Pliam's conclusion represents two separate limitations while

4  sitting – the need to move and the separate need to change her neck position – or one single

5  limitation while sitting – the need to move in order to change her neck position.  Plaintiff argues

6  that the ALJ erred by only focusing on the need to change neck position in hypothetical

7  questions posed to the vocational expert.

8      The court finds that, even if Dr. Pliam intended to suggest two separate sitting

9  limitations, both were accounted for by the ALJ in his residual functional capacity assessment

10  and, consequently, in the hypothetical questions posed to the vocational expert.  Specifically, the

11  ALJ concluded that plaintiff could sit for 6 hours in 2-hour increments.  The allowance for

12  incremental sitting implicitly accounts for a need to move about when sitting.  Had such a need

13  not been recognized in the residual functional capacity assessment, the ALJ would have

14  concluded that plaintiff could sit for the entire 6 hours without interruption.  The ALJ explicitly

15  included the limitation to neck movement when sitting.

16      Turning to plaintiff's argument that the ALJ failed to include in hypothetical

17  questions a limitation to the need to lie down during the day, the court notes that plaintiff does

18  not point to any objective medical evidence of such a limitation.  Rather, she points to her

19  subjective testimony, as well as those from lay witness sources, as evidence of such a limitation.

20  As discussed above, however, the ALJ properly rejected these sources.

21      The court finds that the ALJ relied on answers to hypothetical questions posed to

22  the vocational expert that accurately reflected plaintiff's residual functional capacity.

23  / / /

24  / / /

25  / / /

26  / / /

### IV.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.   Plaintiff's motion for summary judgment (Doc. 21) is denied; and

2.   The Clerk of the Court is directed to enter judgment and close this file.

DATED:  September 21, 2012

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE